2005 VT 125

# Celeste Washington b/n/f Martha Daley and Arthur Washington v. Robin Pierce, as Principal of Harwood Union High School, et al.

[895 A.2d 173]

No. 03-487

Present: **Dooley, Johnson, Skoglund and Reiber, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed December 16, 2005
Motion for Reargument Denied January 20, 2006

*David F. Kelley*, Montpelier, *Eileen M. Blackwood* of *Blackwood Associates, P.C.*, Burlington, and *David Putter*, Montpelier, for Plaintiff-Appellant.

*Heather E. Thomas* of *Lynn & Associates*, Burlington, for Defendants-Appellees.

*Robert Appel*, Montpelier, for Amicus Curiae Vermont Human Rights Commission.

¶ 1. **Skoglund, J.** Plaintiff filed suit alleging that she was denied access to full and equal educational opportunities because of a hostile environment caused by pervasive student-student racial and sexual harassment at Harwood Union High School. On appeal she challenges the superior court's summary judgment dismissal of her claims under Vermont's Public Accommodations Act, 9 V.S.A. §§ 4500-4507, and 16 V.S.A. §§ 565 and 1161a.

¶ 2. This case requires us to decide whether a VPAA claim may be based on allegations of student-student harassment in a school, and, if so, what elements comprise such a claim. In Section III.A, we hold that

such a claim is viable in light of the broad sweep of the VPAA and Vermont's educational statutes aimed at eradicating harassment from places of learning.

¶ 3. Next, we must determine the correct standard by which to measure the conduct of schools and school officials in cases of student-student harassment. All parties, and the trial court, agree that, under any standard, there must be harassing conduct "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). We agree.

¶ 4. The dispute, then, centers on the "mental state" of the school and school officials — plaintiff argues that defendants are liable if they knew or should have known of the harassment, while defendants argue that the trial court correctly held that they could only be liable for their "deliberate indifference" to the harassing conduct. As explained below, we decline to adopt either party's proposed standard. Instead, we hold that in a peer harassment case under the VPAA, a plaintiff must demonstrate that she exhausted her administrative remedies or that a valid reason existed for bypassing those remedies. This standard, imported from the recently-enacted 16 V.S.A. § 14, strikes a balance between the deliberate indifference and negligence standards urged by the parties, and does so by focusing on more easily-ascertainable criteria. In particular, the school's knowledge of the harassment, the point of contention between the parties here, falls out of the equation under this standard — on the one hand, exhaustion of remedies implies actual notice to the school, and, on the other, proof of a valid reason for failing to exhaust remedies relieves the burden to prove notice.

¶ 5. Finally, we must decide whether defendant is entitled to summary judgment under that standard, given the record developed by the parties. We affirm the trial court's grant of summary judgment because plaintiff cannot show that the school had actual notice of the harassment forming the basis of her complaint or that she exhausted her remedies at the school or met an exception to the exhaustion requirement.

## I. Factual Background

¶ 6. The trial court found the following facts to be undisputed. Plaintiff, the daughter of a black father and white mother, attended Harwood Union High School from the fall of 1995 to the 2000 Christmas break. During her time at Harwood, she heard other students

using a wide array of racially and sexually inappropriate terms. She was the target of such expressions only twice, but she heard them at school on a daily basis. The conduct of which she complains never involved faculty or school personnel — the alleged harassment involved students exclusively. She testified at her deposition that she chose not to lodge a complaint with the school about any of the harassing conduct.

¶ 7. Finding the atmosphere at Harwood hostile, plaintiff transferred to Montpelier High School to complete her secondary education, at her parents' expense. In September 2001, plaintiff commenced this action, alleging: (1) a violation of the Vermont Public Accommodations Act, 9 V.S.A. § 4502, claiming that an "atmosphere fraught with ethnic, racial and gender based student harassment" existed at Harwood and deprived her of "full access to the educational benefits intended and expected to be provided by public secondary schools"; and (2) violations of 16 V.S.A. § 565, which requires schools to create anti-harassment policies. In May 2003, defendants moved for summary judgment, arguing, in essence, that plaintiff was seeking to hold defendants liable for failing "to prevent the harassment from happening in the first place." Defendants reasoned that plaintiff had failed, under the deliberate indifference standard announced in *Davis*, 526 U.S. at 650, to allege sufficiently that defendants were on notice regarding the alleged harassment.

¶ 8. In opposing summary judgment, plaintiff relied on the following facts. First, Harwood sent a letter in 1997 to all of its students' families, acknowledging that "the negative attitudes toward others that students exhibit at Harwood are also common generally in society today," and enclosing some relevant reading material. In addition, a teacher supplied an affidavit stating that she filed at least twelve reports "based on some form of harassing behavior" while teaching there from 1994-2001. A member of the community also submitted an affidavit stating that he had witnessed the use of racial epithets at Harwood and had reported them to the principal, defendant Pierce.

¶ 9. In addition, plaintiff's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment highlighted portions of her deposition testimony reflecting that: during her time at Harwood, she would hear racial slurs "every day probably"; she recalled one specific instance when a student directed a racial epithet at her; at some point she was called a "dyke"; that she believed that "some people reported harassment claims"; and she did not think complaining to the administration about any of the above would ameliorate the

problem. Plaintiff also stated in an affidavit that after she left Harwood she learned of a student who had submitted a written complaint describing incidents of racial and sexual comments directed at the complaining student by another student.

¶ 10. Plaintiff also offered the deposition testimony of her mother, Martha Daley. Ms. Daley's testimony, in sum, relates that she: had periodic meetings with school personnel concerning her son, during which she complained about the environment at Harwood; told an individual at the school about specific incidents of racism; and attended meetings at the school aimed at addressing the hostile environment and raising awareness around issues of multi-culturalism. Ms. Daley also testified that she did not complain to the school about racism or harassment directed at plaintiff.

¶ 11. In granting summary judgment, the trial court adopted the deliberate indifference standard. The court concluded that plaintiff had sufficiently alleged that she was exposed to harassment "so severe, pervasive, and objectively offensive" that it could be said to deprive plaintiff of access to the school's educational opportunities or benefits. The court, however, held that plaintiff "has not been able to provide evidence that any school official actually knew of acts of harassment and responded with deliberate indifference." The court also rejected plaintiff's argument that "the acts of harassment were so ubiquitous that school officials must have known about them and could have acted affirmatively on that basis alone." While acknowledging that the "claim that school administrators should have known generally what was going on is consistent with the observation in the June 1997 letter that the community had a problem that was reflected at school," the court concluded that plaintiff failed to support a "reasonable inference that a school official failed to respond to a particular incident."

¶ 12. On appeal, plaintiff argues that the court erred because it applied the wrong legal standard to her hostile environment claim. Rather than requiring deliberate indifference to known misconduct on the part of school and school officials, plaintiff claims that the VPAA permits a hostile environment claim based on peer harassment as long as the school officials knew or should have known of the misconduct. Plaintiff also argues that the court misused the summary judgment standard by shifting to plaintiff the "burden of persuasion" on the issue of defendants' response, or lack thereof, to any alleged acts of

harassment.[1] Defendants maintain that the trial court employed the correct standard based on United States Supreme Court precedent, including *Davis*, which applies the deliberate indifference standard to student claims of harassment brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

## II. Statutory Framework

¶ 13. The VPAA creates a private right of action for certain discrimination claims. Specifically, it prohibits an owner or operator of a "place of public accommodation," or an agent or employee of an owner/operator, from withholding from or denying to any person "any of the accommodations, advantages, facilities and privileges of the place of public accommodation" based on that person's "race, creed, color, national origin, marital status, sex or sexual orientation." 9 V.S.A. § 4502(a). The Act defines a place of public accommodation explicitly to include "any school." *Id.* § 4501(1). Finally, a person aggrieved by a violation of the Act "may bring an action for injunctive relief and compensatory and punitive damages and any other appropriate relief in the superior court of the county in which the violation is alleged to have occurred." *Id.* § 4506(a). We recognize that, "[a]s a remedial statute, the [VPAA] must be liberally construed in order to suppress the evil and advance the remedy intended by the Legislature." *Human Rights Comm'n v. Benevolent & Protective Order of Elks*, 2003 VT 104, ¶ 13, 176 Vt. 125, 839 A.2d 576 (quotations omitted).

¶ 14. This case also implicates several provisions of Title 16 dealing with harassment in schools. In 1994, the Legislature added 16 V.S.A. § 11(a)(26), which defined harassment as

> verbal or physical conduct based on a student's race, creed, color, national origin, marital status, sex, sexual orientation or disability and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment. Sexual harassment is also a form of unlawful harassment and means unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature.

[1] The court also dismissed plaintiff's second count, which alleged negligence per se based on the school's purported failure to adopt and maintain an anti-harassment policy in violation of 16 V.S.A. § 565. Because plaintiff has not pursued this point on appeal, we do not address it.

1993, No. 162 (Adj. Sess.), § 2. At the same time, the Legislature added 16 V.S.A. § 565, requiring all Vermont schools to adopt a harassment policy and procedures for dealing with harassment of students. *Id.* § 4. In May 2000, the Legislature amended § 565, to require that harassment policies include procedures directing students and staff how to report violations and file complaints and outlining how to investigate such reports. 1999, No. 120 (Adj. Sess.), § 6.

¶ 15. Although they occurred after the operative events at issue here, we also note several key amendments the Legislature passed in 2004. First, the Legislature amended § 11(a)(26)'s definition of harassment to encompass

> an incident or incidents of verbal, written, visual, or physical conduct based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation, or disability that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment.

2003, No. 91 (Adj. Sess.), § 2. It also added subsections 26(B)(i)-(iii), which define, respectively, sexual harassment, racial harassment, and harassment based on other protected categories. *Id.* Second, § 565 was amended to provide time limits within which a school must investigate and decide on reports of harassment and to establish a procedure for independent review of a school's final determination of a harassment complaint. *Id.* § 4.

¶ 16. Third, the Legislature added § 14 to Title 16. *Id.* § 3. Section 14(a) provides that "[a]n educational institution that receives actual notice of alleged conduct that may constitute harassment shall promptly investigate to determine whether harassment occurred." 16 V.S.A. § 14(a). The statute then directly addresses claims brought under the VPAA:

> In regard to claims brought pursuant to 9 V.S.A. chapter 139, if after notice, the educational institution finds that the alleged conduct occurred and that it constitutes harassment, the educational institution shall take prompt and appropriate remedial action reasonably calculated to stop the harassment. *No action shall be brought pursuant to 9 V.S.A. chapter 139 until the administrative remedies available to the claimant*

*under the policy adopted by the educational institution pursuant to subsection ... 565(b) of this title ... have been exhausted. Such a showing shall not be necessary where the claimant demonstrates that: (1) the educational institution does not maintain such a policy; (2) a determination has not been rendered within the time limits established under subdivision 565(b)(1) of this title; (3) the health or safety of the complainant would be jeopardized otherwise; (4) exhaustion would be futile; or (5) requiring exhaustion would subject the student to substantial and imminent retaliation.*

*Id.* § 14(b) (emphasis added). Thus, the Legislature has conditioned a harassment victim's ability to seek relief in court under the VPAA on the victim's exhaustion of his or her administrative remedies, or proof of a valid reason for not exhausting those remedies.

### III. Legal Analysis

¶ 17. We review a trial court's grant of summary judgment de novo, applying the same standard as the trial court. *Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co.*, 2004 VT 124, ¶ 14, 177 Vt. 421, 869 A.2d 82. We grant summary judgment if there are no genuine issues as to any material fact, and any party is entitled to summary judgment as a matter of law. V.R.C.P. 56(c)(3). Our review of legal questions presented by a summary judgment motion is plenary and nondeferential. *Hardwick Recycling & Salvage, Inc.*, 2004 VT 124, ¶ 14. "If the nonmoving party fails to establish an essential element of its case on which it has the burden of proof at trial, the moving party is entitled to summary judgment as a matter of law." *State v. G.S. Blodgett Co.*, 163 Vt. 175, 180, 656 A.2d 984, 988 (1995).

### A. Availability of VPAA for student-student harassment claims

¶ 18. We conclude that the VPAA encompasses hostile school environment claims based on peer harassment. When the Legislature added 16 V.S.A. § 11(a)(26)'s definition of harassment and 16 V.S.A. § 565's requirement that schools adopt harassment policies, it stated that, in doing so, it "intended to implement the provisions of [the VPAA] as they affect schools as places of public accommodation." 1993, No. 162 (Adj. Sess.), § 1. A school administration's power over its students is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995); see also *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) (recognizing

that school officials have "comprehensive authority" over students, "consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools"). This authority necessarily places a responsibility on school administrators to exercise their power so as to provide their charges with an atmosphere conducive to education and personal growth, free from impediments like pervasive student misbehavior. Not surprisingly, the Legislature has explicitly recognized that "it is the policy of the state of Vermont that all Vermont educational institutions provide safe, orderly, civil and positive learning environments." 1999, No. 120 (Adj. Sess.), § 1.

¶ 19. In light of these responsibilities, the VPAA encompasses claims against school officials, as owners and operators of places of public accommodation, as well as their agents and employees, for unlawful in-school harassment of their students, even when the harassing conduct is perpetrated by other students. First, 16 V.S.A. § 11(a)(26)'s definition of harassment at the time of the alleged claim is broad enough to cover harassing conduct by students. See 1993, No. 162 (Adj. Sess.), § 2 (defining harassment as "verbal or physical conduct based on a student's race, creed, color, national origin, marital status, sex, sexual orientation or disability and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment"). Nothing in the statute exempts conduct committed by students from its definition of harassment.[2] To read the definition otherwise would conflict with the Legislature's stated purpose to rid Vermont schools of harassment. See 1999, No. 120 (Adj. Sess.), § 1 ("Harassment, hazing and bullying have no place and will not be tolerated in Vermont schools. No Vermont student should feel threatened or be discriminated against while enrolled in a Vermont school.").

¶ 20. Further, the clear links between the anti-harassment provisions of Title 16 and the VPAA confirm that the Legislature intended harassment in schools, including that perpetrated by students, to come within the VPAA's sweep. The VPAA makes it unlawful to, "because of the race, creed, color, national origin, marital status, sex or sexual orientation of any person, refuse, withhold from or deny to that person

---

[2] The current version of 16 V.S.A. § 11(a)(26) expands on the former definition by including "incidents of verbal, written, visual, or physical conduct based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation or disability."

any of the accommodations, advantages, facilities and privileges of the place of public accommodation." 9 V.S.A. § 4502(a). The Act expressly includes "any school" within its definition of a "place of public accommodation." *Id.* § 4501(1). Thus, the definition of harassment in 16 V.S.A. § 11(a)(26) mirrors the VPAA's definition of unlawful conduct in the context of harassment in schools.

¶ 21. Additionally, when the Legislature added 16 V.S.A. § 11(a)(26)'s definition of harassment and § 565's requirement that schools adopt anti-harassment policies, its stated purpose was "to protect students by defining unlawful harassment as a form of discrimination which *withholds from or denies to* a student the *accommodations, advantages, facilities, and privileges of* the school." 1993, No. 162 (Adj. Sess.), § 1 (emphasis added). The emphasized language appears verbatim in § 4502(a) of the VPAA, suggesting that the Legislature intended that any form of harassment in school, whether perpetrated by staff or students, would violate the VPAA.

¶ 22. Further, the 2004 amendments to Title 16 make explicit reference to VPAA claims for in-school harassment. For example, 16 V.S.A. § 14(b) explains an educational institution's obligation to take prompt remedial action "[i]n regard to claims brought pursuant to 9 V.S.A. chapter 139," when it has received actual notice of conduct that may be harassment. Section 14(b) also states that "[n]o action shall be brought pursuant to 9 V.S.A. chapter 139 until" the plaintiff has exhausted the school's administrative remedies or satisfied one of the exceptions to the exhaustion requirement. Thus, the addition of 16 V.S.A. § 14 confirms that the Legislature envisioned the VPAA as the means of legal redress for victims of in-school harassment. Accordingly, given the fact that § 11(a)(26)'s definition of harassment includes harassment committed by students, we hold that the VPAA encompasses claims based on in-school student-student harassment.

B. Standard of conduct for VPAA student-student harassment claims

¶ 23. As explained above, the parties diverge sharply on the issue of what standard of conduct governs a school's liability in a hostile environment claim based on student harassment. Defendants advocate for the more stringent standard applied by federal courts in student harassment cases under Title IX, which requires the student to demonstrate that school officials were deliberately indifferent to harassment of which they had actual knowledge. Plaintiff, proposing a standard similar to that used in Title VII workplace harassment cases, asserts that, in addition to pervasive harassing conduct described

above, she need prove only "that the school administration knew or in the exercise of reasonable care should have known of the harassment."

¶ 24. Several Vermont trial courts have decided student-student harassment cases under the VPAA and reached different conclusions about which standard applies. Compare *N.S. v. St. Johnsbury Sch. Dist.*, No. S-301-11-99 Cacv, Special Jury Interrogs. at 1 (Caledonia Super. Ct. Apr. 12, 2002) (requiring jury to determine whether defendants failed to take "timely, appropriate and reasonable steps" to prevent harassment "after they knew or should have known of the existence of such harassment"); *DeBono v. Milton Town Sch. Dist.*, No. S1789-97 CnC, slip op. at 6-9 (Chittenden Super. Ct. Apr. 20, 2001) (holding that deliberate indifference standard did not apply to negligent supervision claim and denying defendants' summary judgment motion as to plaintiff's VPAA claim based on student-student sexual harassment); and *Houlahan v. Norwich Univ.*, No. 26-1-98 Wncv, slip op. at 7-8 (Washington Super. Ct. Apr. 24, 2000) (holding that plaintiff must show notice on part of school, but need not show deliberate indifference), with *S.R. v. Montpelier Sch. Dist.*, No. 503-99 WnCv, slip op. at 5-6 (Washington Super. Ct. Feb. 1, 2001) (applying deliberate indifference standard to student-student harassment claim). Therefore, we take this opportunity to clarify the standard for such claims going forward.

## 1.

¶ 25. Defendants urge us to affirm the trial court's application of the deliberate indifference standard that has evolved as the federal courts have addressed peer harassment in schools under federal anti-discrimination statutes. Most of those cases have attempted to hold schools and school officials liable for student-student sexual harassment under Title IX of the Education Amendments of 1972. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

¶ 26. An implied private right of action for money damages exists under Title IX, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 74-75 (1992), and, in "certain limited circumstances," it encompasses claims against schools and school officials based on peer harassment, *Davis*, 526 U.S. at 643. Specifically, recipients of Title IX funds are liable "only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive,

and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Addressing the severity of the harassing behavior necessary to sustain a claim, the *Davis* Court recognized that because "students are still learning how to interact appropriately with their peers," they may regularly engage in conduct that "would be unacceptable among adults" and is "upsetting to the students subjected to it." *Id.* at 651-52.

¶ 27. The *Davis* Court also explained that, in order to ensure that school administrators "continue to enjoy the flexibility they require," a school is deliberately indifferent to peer harassment of its students "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. Thus, in the context of a Title IX claim, "there is no reason why courts . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

¶ 28. Because it has "repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause," the Court adopted the deliberate indifference standard in order to guarantee that a funding recipient could be liable only for conduct about which it had adequate notice. *Id.* at 640. Legislation enacted under the Spending Clause is "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981). Thus, a Title IX recipient cannot be liable if it is unaware of those conditions or "unable to ascertain what is expected of it." *Id.* The deliberate indifference standard comports with the Court's Spending Clause jurisprudence because it conditions liability on the funding recipient's intentional violation of Title IX resulting from its decision to remain deliberately indifferent to acts of harassment.

¶ 29. We do not agree with defendants and the trial court that the deliberate indifference standard imported from *Davis* applies to a claim brought under the VPAA. Because Title IX was created under Congress's Spending Clause authority, the *Davis* Court limited the liability of a funding recipient to damages resulting from "its *own* decision to remain idle in the face of known student-on-student harassment in its schools." 526 U.S. at 641. By contrast, the VPAA is a remedial statute aimed at "protect[ing] the citizens of Vermont from 'a number of serious social and personal harms.'" *Human Rights Comm'n v. Benevolent & Protective Order of Elks,* 2003 VT 104, ¶ 14 (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 625 (1984)).

Unlike Title IX — which essentially affords a school a choice between receiving funds as long as the school complies with the Act or not complying and thus not receiving funds — the VPAA requires all Vermont schools to comply. Thus, the VPAA's remedies are not cabined by the contractual considerations present in the context of Spending Clause litigation. In addition, the VPAA, unlike Title IX, provides an express private right of action. 9 V.S.A. § 4506(a). Accordingly, the VPAA is sufficiently distinguishable from Title IX in its structure and purpose that we are not inclined to apply the liability standard fashioned under those federal statutes to a VPAA claim.

2.

¶ 30. Next, we explain our rationale for declining to adopt plaintiff's proposed standard. Plaintiff advocates that defendants' conduct should be measured under a "knew or should have known" standard, relying on caselaw addressing Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.* § 2000e-2(a)(1). While Title VII seeks to compensate victims of unlawful employment discrimination, its main objective, "like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805-06 (1998). To that end, the United States Supreme Court has conditioned an employer's vicarious liability for harassment perpetrated by its employee on both the employer's efforts to prevent and promptly rectify harassing behavior and the "coordinate duty" of the victim to avoid or mitigate harm. *Id.* at 806. Thus, in *Faragher*,[3] the Court held that an employer could defend a harassment claim based on a hostile work environment by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807.

¶ 31. The standard proposed by plaintiff, then, is a truncated version of the Title VII standard — she asserts that a school should be liable

---

[3] The Court announced the same holding in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998), decided the same day as *Faragher*.

under the VPAA if school officials knew or should have known there was harassment severe and pervasive enough to deny a student the privileges and benefits of the school. Plaintiff's version eliminates from consideration (1) the steps, if any, taken by a school to prevent harassment and/or to correct it once it occurs, and (2) whether the alleged victim utilized the school's "preventive or remedial apparatus." *Id.* As a result, plaintiff's standard would expose schools to far greater liability than the VPAA can be construed to allow — for example, it would render a school liable regardless of how quickly and effectively it responded to an incident. Accordingly, we decline to adopt the standard proposed by plaintiff.

3.

¶ 32. So what standard should be used to measure the conduct of schools and school officials? In 2004, the Legislature suggested a resolution when it amended 16 V.S.A. §§ 11(a)(26) and 565, and, more importantly, added 16 V.S.A. § 14. 2003, No. 91 (Adj. Sess.), §§ 2-4. In passing Act 91, the Legislature specifically declared its intent to "recognize that educational institutions should have the opportunity to remedy promptly and appropriately allegations of harassment." *Id.* § 1(4). Therefore, the standard for VPAA claims must accommodate both a student's right to be "free of harassment in educational institutions," *id.* § 1(3), and a school's opportunity to respond to alleged harassment before being subject to litigation.

¶ 33. Before we fill out the elements of a VPAA claim for peer harassment, we note that we may properly consider Act 91 even though it was passed after the conduct at issue here. Where, as here, a legislative body enacts a law that clarifies an earlier law, the "subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Loving v. United States*, 517 U.S. 748, 770 (1996) (quotations omitted). Because the later act can be viewed as the legislative body's interpretation of the earlier act "in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting," the later act is accorded "great weight in resolving any ambiguities and doubts." *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) (quotations omitted). When it passed Act 91, the Legislature spoke directly to the level of knowledge on the part of a school that a plaintiff must show in order to bring a valid claim for harassment under the VPAA — an issue upon which we have not ruled, and upon which neither the VPAA nor the pre-Act 91 anti-harassment statutes shed any light. Thus, we may properly consider

Act 91 here. See *In re Estate of Evanco*, 955 P.2d 525, 528 (Alaska 1998) ("When an ambiguous statute that we have not construed and an unambiguous successor statute can reasonably be interpreted in a consistent manner, the policy embodied in the successor statute is a factor that is appropriately considered in interpreting the old statute."); see also 2B N. Singer, Statutes and Statutory Construction § 49:11, at 126 (rev. ed. 2000) ("Permitting subsequent amendments to control the doubtful meaning of a former statute removes a great deal of uncertainty in the law.").

¶ 34. By the plain language of 16 V.S.A. § 14(b), the Legislature balanced the coordinate duties of the school to provide a harassment-free environment and the harassment victim to look first to the school's mechanisms to redress in-school harassment. To that end, the statute, on the one hand, precludes the filing of a VPAA action "until the administrative remedies available to the claimant under the policy adopted by the educational institution pursuant to subsection 166(e) or 565(b) of this title ... have been exhausted." *Id.* § 14(b). On the other hand, § 14(b) also includes five exceptions to the exhaustion requirement:

> Such a showing shall not be necessary where the claimant demonstrates that: (1) the educational institution does not maintain such a policy; (2) a determination has not been rendered within the time limits established under subdivision 565(b)(1) of this title; (3) the health or safety of the complainant would be jeopardized otherwise; (4) exhaustion would be futile; or (5) requiring exhaustion would subject the student to substantial and imminent retaliation.

■ ¶ 35. Accordingly, we hold that a plaintiff bringing a VPAA action based on a hostile school environment created by student-student harassment must show that: (1) he or she was the victim of harassing conduct so severe, pervasive, and objectively offensive that it deprived him or her of access to the educational opportunities or benefits provided by the school; and (2) the plaintiff exhausted the administrative remedies available, or that circumstances existed that relieved the plaintiff of the exhaustion requirement.

¶ 36. This approach yields a number of advantages over the standards proposed by the parties. First, it eliminates the necessity of a separate inquiry into the state of the school's knowledge or the notice received by the school. This follows because, on the one hand, notice on the part of the school would follow logically from a showing that the

plaintiff exhausted his or her remedies. On the other hand, by showing that one of the exceptions to the exhaustion requirement applies, the plaintiff will have implicitly proven that a valid reason existed for allowing the action to proceed regardless of whether the school had notice.

¶ 37. At the same time, this standard provides courts with objective criteria for evaluating the conduct of the parties in a hostile school environment harassment case to a greater extent than the "knew or should have known" standard proposed by plaintiff or the deliberate indifference standard. See D. Greene, "You're So Gay!": Anti-Gay Harassment in Vermont Public Schools, 27 Vt. L. Rev. 919, 949-50 (2003) (suggesting that courts import the objective criteria of Title 16's anti-harassment statutes into harassment claims brought under the VPAA). For example, a school is deliberately indifferent "only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Davis*, 526 U.S. at 648 (emphasis added). The standard we announce today replaces the "clearly unreasonable" determination with an inquiry into whether the school made adequate remedies available and whether the victim failed to exhaust them. Similarly, the exhaustion inquiry rests on a more easily-ascertainable set of facts than whether school officials should have known of harassing conduct. And the exceptions to the exhaustion requirement now set forth in 16 V.S.A. § 14(b) largely turn on objective criteria — the presence of a policy that complies with 16 V.S.A. § 565, the timing of the school's determination of a harassment complaint, the effect exhaustion would have on the victim's health or safety, or the likelihood of retaliation. 16 V.S.A. § 14(b)(1)-(3), (5). Although the fourth exception, the futility of exhausting one's administrative remedies, § 14(b)(4), is potentially more open-ended than the other four, overall the standard we announce today provides courts with more concrete, verifiable measures for testing a VPAA harassment claim than would either of the standards proposed by the parties.

¶ 38. This standard also has the advantage of promoting compliance with the anti-harassment provisions of Title 16. In particular, by emphasizing the harassment policy mandated by 16 V.S.A. §§ 166(e) and 565(b), it both provides an incentive for schools to adopt, publicize, and enforce these policies, which must include procedures for reporting harassment, 16 V.S.A. § 565(b)(1), and encourages victims to mitigate harm by utilizing the school's remedial procedures before resorting to litigation.

¶ 39. In addition, because this approach grafts the anti-harassment provisions of Title 16 onto the analysis of a VPAA harassment claim, it

highlights the VPAA as a means to further the Legislature's stated goals of "protect[ing] students by defining unlawful harassment as a form of discrimination," 1993, No. 162 (Adj. Sess.), § 1, and guaranteeing "safe, orderly, civil and positive learning environments" for all Vermont students, 1999, No. 120 (Adj. Sess.), § 1. In this way, it reflects the Legislature's intent to read Title 16 and the VPAA as complementary parts of a scheme to combat harassment in Vermont schools.

4.

¶ 40. Applying this standard to the case at hand, we reject the trial court's use of the deliberate indifference standard, but nonetheless we affirm its decision to grant summary judgment in defendants' favor because, as a matter of law, plaintiff cannot demonstrate that she exhausted her remedies at the school or that she somehow was relieved of that responsibility.

¶ 41. The facts adduced by plaintiff in response to defendants' summary judgment motion, at best, demonstrate that plaintiff's mother expressed some general grievances to unidentified school officials, and that plaintiff herself did not lodge any complaints with the school administration regarding harassing conduct by other students. Indeed, plaintiff admits that she chose not to complain to any school administrator or teacher, nor did she engage the administrative remedies available to her through the school. Additionally, plaintiff presented no evidence that any misconduct occurred in the presence of school personnel. Although plaintiff did proffer evidence of a complaint made by another student, there is no identifiable link between that complaint and the conduct of which plaintiff complains. Accordingly, by choosing not to raise any complaints with a school official, plaintiff failed to exhaust her administrative remedies. Thus, her claim cannot survive summary judgment unless one of the exceptions to the exhaustion requirement applies.

¶ 42. In that regard, the record is devoid of any evidence suggesting that complaining to school officials would have placed plaintiff's health or safety in jeopardy or subjected plaintiff to retaliation. Additionally, because there was no complaint before the school, there was no possibility of the school failing to make a determination within the statutory time limits.

¶ 43. With respect to the futility of complaining to school officials, although plaintiff did supply evidence of complaints having been lodged by other students, she did not furnish any evidence suggesting that the school somehow mishandled those complaints. While plaintiff testified

that harassment went on "every single day in the hallways" so that school officials "must be deaf or blind or something," she offered no evidence that the school had mishandled or refused to deal with issues of which it was aware. Moreover, she testified that she was aware that she could report inappropriate behavior to the administration, and that the administration could then take steps to punish those responsible. Nonetheless, she testified that she chose not to complain because, in her view, it would be "dumb" and not "appropriate" to punish offending students, rather than educate them. In short, the record shows that plaintiff decided not to complain because she believed education was a better policy than punishment, not because she thought the school would do nothing if she did complain. This disagreement over how best to address harassment issues in no way indicates that lodging a complaint would have been futile.

¶ 44. Thus, the only exception that remains as a possibility is the school's failure to maintain a harassment policy pursuant to 16 V.S.A. § 565(b). The school's anti-harassment policy was published to students and parents within the school's student handbook. The record contains copies of the handbook for academic years 1997-98 through 2000-01, which are substantially identical. In substance, the policy: defines harassment, both in general and with reference to specific categories; states that any unlawful harassment by a member of the school, including a student, is a policy violation; states that the school "will act to investigate all complaints of harassment, either formal or informal, verbal or written"; provides that any person found to violate the policy may be subject to consequences ranging from warning to expulsion or termination; and prohibits retaliation.

¶ 45. In most respects, the policy comports with the original version of 16 V.S.A. § 565, which was in effect at all times relevant to this case.[4] That version of § 565(a) required each school's policy to include a statement prohibiting unlawful harassment of students, a definition of harassment pursuant to 16 V.S.A. § 11(a)(26), and consequences and appropriate remedial action for violators. As noted above, the Harwood policy contains each of these elements. Section 565(b)(1)-(3) required each school district to establish rules for dealing with harassment, including procedures for reporting harassment, a procedure for publicizing the appropriate state and federal agencies to receive

---

[4] Plaintiff attended Harwood from 1995 until the 2000 Christmas break. Section 565 was amended in May 2000, with an effective date of August 1, 2001 for each school district to come into compliance. 1999, No. 120 (Adj. Sess.), § 11(b).

harassment complaints, and a statement that retaliation is unlawful under the VPAA. Although the Harwood policy's statement concerning retaliation did not mention the VPAA, it substantially complied with § 565(b)(3) in that it clearly stated that retaliation was prohibited.

¶ 46. It is not clear, however, that the school adopted procedures for reporting harassment or for publicizing the government agencies available to field complaints. Although the record contains no rules promulgated by the school concerning these issues, the policy does speak to the issue of reporting, stating that the school "will act to investigate all complaints of harassment, either formal or informal, verbal or written." Thus, the policy makes clear that the school as an institution stood ready to receive even informal, oral reports of harassment and act upon them. Accordingly, we do not find this discrepancy between the school's anti-harassment policy and § 565 sufficient to conclude that the school did not maintain a policy pursuant to § 565. Similarly, we conclude that the absence of a procedure for publicizing to students the availability of governmental actors to receive complaints does not show that the school failed to maintain a policy pursuant to § 565(b), especially given plaintiff's testimony that she deliberately chose not to report the alleged harassment even to school officials.

¶ 47. Therefore, plaintiff cannot demonstrate that any of the exceptions to the exhaustion requirement applies here. Because there is no dispute that she did not even begin to engage, let alone exhaust, the school's remedial process, we conclude that her VPAA claim founders and was properly dismissed by the superior court.

¶ 48. In the context of a summary judgment motion, "[w]here the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 18, 665 A.2d 580, 583 (1995). Upon such a showing, "[t]he burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact." *Id.* As explained above, plaintiff cannot demonstrate a triable issue as to the exhaustion of remedies or the existence of an exception to the exhaustion requirement. Accordingly, while we reject the deliberate indifference standard applied by the trial court, we nonetheless affirm the trial court's grant of summary judgment in favor of defendants.

*Affirmed.*