VERMONT SUPERIOR COURT
Windsor Unit
12 The Green
Woodstock VT  05091
802-457-2121
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 23-CV-01822



Alejandro Figueroa
  Plaintiff

v.

The Woodstock Resort Corp. and Devon Kurtz
  Defendants

### Decision on Defendant Devon Kurtz's Special Motion to Strike

Plaintiff Alejandro Figueroa was formerly employed as the athletic director at the Woodstock Inn and Resort. He was fired in the spring of 2023, and his departure thereafter became the subject of gossip and speculation amongst club patrons. One of those patrons, defendant Devon Kurtz, wrote a letter to the editor of the local newspaper, purporting to "speak up" about the circumstances of the termination. He wrote that he could not address "the specific reasons" as to why plaintiff was fired, but that he would "speak to what happened to me directly." He then recounted a particular instance in which plaintiff allegedly sexually harassed him while he was using the resort's athletic facilities. He also wrote that, during the same event, plaintiff admitted to sexually harassing another employee under plaintiff's supervision, and that there had been a "documented pattern" of plaintiff "allegedly targeting young men at the club with sexual remarks and advances."

Defendant's letter also addressed broader themes. Defendant contextualized plaintiff's behavior as having been enabled by an "unaccountable organizational culture" at the resort, and he wrote that the purpose of his letter was to discuss "[t]he institutional failings of a flagship organization in the heart of our town," and the "reverberating effects" of those failures upon the economic and cultural vitality of the community. He ended the letter with a public call to support the employees of the resort.

Plaintiff has sued both defendant and the resort for defamation and false light.[1] Plaintiff's claims are based upon the publication of the letter. More specifically, plaintiff alleges that the following descriptions were false: (1) defendant's testimonial about "what happened to me directly," (2) defendant's assertion that plaintiff admitted to sexually harassing another employee under his supervision, and (3) defendant's assertion that there was a "documented pattern" of plaintiff "allegedly targeting young men at the club with sexual remarks and advances." Plaintiff contends that the

---

[1] The claims against the resort for defamation and false light are not addressed by this opinion, because the resort has not filed its own motion to strike with respect to these claims. Plaintiff also asserts several other claims against the resort related to his employment termination; those claims are not addressed by this decision.

publication of the letter caused him to experience "serious injury in the form of embarrassment, humiliation, anxiety, and a weakened ability to find gainful employment and advance his career." He also contends, without further elaboration, that the publication of the letter caused him to suffer "lost compensation, benefits, and career opportunities."[2]

Defendant Kurtz has filed a special motion to strike under 12 V.S.A. § 1041. His motion is brought under a statute that was enacted about twenty years ago as part of a nationwide response to "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and freedom to petition the government for the redress of grievances." *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 29, 200 Vt. 465. In their original form, these lawsuits, known as "strategic lawsuits against public participation," involved situations where environmental activists opposed a development project, and the developer responded by suing the activists, e.g., *Protect Our Mountain Environment, Inc. v. District Court*, 677 P.2d 1361, 1363–64, 1368 (Colo. 1984); *Baker v. Parsons*, 750 N.E.2d 953, 956–57 (Mass. 2001). By suing the activists, the developer did not necessarily intend to prevail on the merits, but rather intended to impose litigation costs upon them, and thereby deter them and others from continuing their opposition to the permit, or from speaking out publicly in the future. *Felis*, 2015 VT 129, ¶¶ 29–30; *Jang v. Trustees of St. Johnsbury Academy*, 331 F.Supp.3d 312, 335 (D. Vt. 2018); *Morse Bros., Inc. v. Webster*, 772 A.2d 842, 846 (Me. 2001); *Duracraft Corp. v. Holmes Products Corp.*, 691 N.E.2d 935, 940 (Mass. 1998).

Legislatures across the country responded to the prevalence of these lawsuits by enacting statutes that were meant to "stop" "strategic lawsuits against public participation" "early in [their] tracks." *Nader v. Maine Democratic Party*, 2012 ME 57, ¶ 14, 41 A.3d 551; *Blanchard v. Steward Carney Hosp., Inc.*, 75 N.E.3d 21, 36 (Mass. 2017). These so-called "anti-SLAPP" statutes function by allowing the activists to file a special motion to dismiss upon commencement of the case, before litigation costs are incurred. The idea of the statutes is to "prevent the misuse of the courts." *Felis*, 2015 VT 129, ¶ 30; *Jang v. Trustees of St. Johnsbury Academy*, 331 F.Supp.3d 312, 335 (D. Vt. 2018).

Like other anti-SLAPP statutes, the plain language of 12 V.S.A. § 1041 does not limit its application to the context of environmental activism. Legislatures across the country have experimented with various formulations of the substantive and procedural standards, and courts have reached different conclusions about the scope of the statute's protections, e.g., *Nader*, 2012 ME 57, ¶ 14; *Blanchard*, 75 N.E.3d at 35. In Vermont, for example, there are numerous recent cases in which media organizations have successfully used the statute to obtain dismissal of frivolous defamation actions, especially in cases involving reporting about crime and the criminal-justice system, e.g., *Wolfe v. VT Digger*, 2023 VT 50; *Rivard v. Brattleboro Reformer*, No. 23-AP-149, 2023 WL 5994216 (Vt. Sept. 2023) (unpub. mem.); *Gibbons v. Gray*, No. 23-AP-055, 2023 WL 5994062 (Vt. Sept. 2023) (unpub. mem.); *Cornelius v. Chronicle, Inc.*, 2019 VT 4, 209 Vt. 405; *Cegalis v. Hewitt*, No. 13-1-17 Wncv, 2017 WL 11636068 (Vt. Super. Ct. May 8, 2017) (Teachout, J.); *Chandler v. Rutland Herald Publishing*, No. 2015-265, 2015 WL 7628687 (Vt. Nov. 2015) (unpub. mem.). Some states agree with Vermont that their anti-SLAPP statute protects media organizations against frivolous defamation actions, e.g., *Smith v. Supple*, 293 A.3d 851, 861–62 (Conn. 2023), whereas other states have held that their anti-SLAPP statutes do not apply to these types of cases, e.g., *Gaudette v. Mainely Media, LLC*, 2017 ME 87, ¶¶ 13–18, 160 A.3d 539; *Fustolo v. Hollander*, 920 N.E.2d 837, 844 (Mass. 2010). In other words, there is a wide variety of views from one jurisdiction to another about how these statutes

---

[2] Plaintiff's employment was terminated before the letter was published.

function, and to what types of cases they should apply. A nationwide search reveals thousands of reported opinions discussing the application of anti-SLAPP statutes to all manner of civil actions, including but not limited to employment-discrimination cases, defamation cases, and cases arising from university sexual-assault adjudications. Outcomes vary, depending upon the facts of each case and the language of the particular anti-SLAPP statute at issue.

In Vermont, § 1041 provides that a defendant may file a special motion to dismiss within the first sixty days of the proceeding. The defendant bears the initial burden of establishing that the lawsuit is indeed a "strategic lawsuit against public participation" by showing that the lawsuit arose from their exercise of the right of freedom of speech "in connection with a public issue." 12 V.S.A. § 1041(a). If that showing is made, the special motion is granted, and the case is dismissed, unless the plaintiff shows that the defendant's underlying exercise of free-speech rights was "devoid of any reasonable factual support and any arguable basis in law," and that the defendant's actions "caused actual injury" to the plaintiff. 12 V.S.A. § 1041(e)(1).

At issue first is whether the defendant has established that this lawsuit arises from his exercise of the right of freedom of speech in connection with a public issue. *Wolfe*, 2023 VT 50, ¶ 18; *Cornelius*, 2019 VT 4, ¶ 8, 209 Vt. 405; *Jang*, 331 F.Supp.3d at 335.

As mentioned above, plaintiff has sued defendant for defamation and false light based upon statements contained within defendant's letter to the editor. A letter to the editor of a newspaper is a classic example of a public statement, and is unquestionably an exercise of the right of free speech. *Bock v. Smith*, No. 2017-176, 2017 WL 5989987 (Vt. Nov. 2017) (unpub. mem.); *Schelling v. Lindell*, 2008 ME 59, ¶ 13, 942 A.2d 1226; *Maietta Construction, Inc. v. Wainwright*, 2004 ME 53, ¶ 8, 847 A.2d 1169; *Cardno ChemRisk, LLC v. Foytlin*, 68 N.E.3d 1180, 1187 (Mass. 2017).

A public statement is not protected by the statute, however, unless the statement also "concern[s] an issue of public interest." 12 V.S.A. § 1041(i)(3); *Wolfe*, 2023 VT 50, ¶ 8; *Cornelius*, 2019 VT 4, ¶ 8; *Jang*, 331 F.Supp.3d at 335. Exactly what it means for a public statement to concern an issue of public interest is not defined in the statute. A review of existing cases suggests that the determination is fact-dependent, involving considerations such as the circumstances of the speech, the public profiles of the parties involved, and whether the statements involved material that could affect members of the public beyond the direct participants involved. *Jang*, 331 F.Supp.3d at 337 & 341–42; *Felis*, 2015 VT 129, ¶¶ 47–52, 200 Vt. 465. Many other formulations and considerations are articulated in the cases, all directed in one way or another towards assessing whether the case implicates the concerns meant to be protected by the statute, or whether the speech involved was more private in nature, e.g., *Felis*, 2015 VT 129, ¶¶ 50–53; *Jang*, 331 F.Supp.3d at 336; *Ernst v. Kauffman*, 2016 WL 1610608 (D. Vt. Apr. 20, 2016); *Weinberg v. Feisel*, 2 Cal.Rptr.3d 385, 392–93 (Cal. Ct. App. 2003); Blum, *Application of Anti-SLAPP (Strategic Lawsuit Against Public Participation) Statutes to Defamation Claims Related to Website or Internet Postings*, 47 A.L.R.7th Art. 7 (2019). As applied to this case, the court finds it less helpful to gather the various factors that have been articulated in the reported opinions, and more helpful to focus on the specific aspects of this case that the court finds to be meaningful.

First, the letter involved a description of unwelcome sexual overtures. Recent national conversation has encouraged the public disclosure of incidents of sexual abuse and sexual harassment. Defamation lawsuits have followed from some of these disclosures, and parties have filed responsive motions to dismiss under anti-SLAPP statutes. In addressing these motions, courts have emphasized the important public policies that "encourage alleged victims to speak up instead of covering up misconduct and risking the future victimization of others," *Dossett v. Ho-Chunk, Inc.*, 472 F.Supp.3d 900, 909 (D. Or. 2020). Courts have also acknowledged the ways in which defamation law can be used to deter survivors of domestic and sexual violence from speaking about their lived experiences. A number of cases have now recognized that disclosures of sexual misconduct are a matter of widespread public interest, and that public disclosures are protected expressions under anti-SLAPP statutes, e.g., *id.*; *Shahid Buttar for Congress Committee v. Hearst Communications*, 2023 WL 2065044 (N.D. Cal. Feb. 16, 2023); *Goldman v. Reddington*, 2021 WL 4099462 (E.D.N.Y., Sept. 9, 2021); *Coleman v. Grand*, 523 F.Supp.3d 244, 259–60 (E.D.N.Y. 2021); *Wentworth v. Hemenway*, 2019 WL 2368520 (Cal. Ct. App., June 5, 2019).

Second, the letter described sexual harassment that occurred to a customer in a place of public accommodation. In this regard, the letter is similar to a negative business review posted by a customer on a public website, warning other customers to stay away, either because of the quality of services provided, or because of conduct occurring at that place. Cases from other states have held that business reviews of this nature generally involve issues of widespread public interest, at least where the review presents information that would assist others in choosing whether to patronize the business, e.g., *Wong v. Jin*, 117 Cal.Rptr.3d 747, 759 (Cal. Ct. App. 2010); *Aristocrat Plastic Surgery, P.C. v. Silva*, 169 N.Y.S.3d 272, 276 (N.Y. App. Div. 2022).

Third, the letter described the occurrence of sexual harassment in a workplace. Every employer has an obligation to "ensure a workplace free of sexual harassment," and Vermont's legislature has made it clear that sexual harassment is "a serious problem" that harms others in addition to the employees directly involved. 21 V.S.A. § 495h(a)(1); 1993, No. 39, § 1. The Legislature has also declared public policy to be "facilitat[ing] the identification of incidents of sexual harassment so that such acts may cease." 1993, No. 39, § 1. These are objective reference points in support of the conclusion that public statements regarding sexual harassment in the workplace are matters of public concern in Vermont, and therefore protected under § 1041. A similar observation could be made about public statements regarding sexual harassment and sexual misconduct occurring in educational environments, e.g., 16 V.S.A. § 11(a)(26); *Washington v. Pierce*, 2005 VT 125, 179 Vt. 318; *Higgins v. St. Margaret's Episcopal School*, 2021 WL 6050622 (Cal. Ct. App., Dec. 21, 2021); *Hemenway*, 2019 WL 2368520 at *6.

Certain aspects of the letter are more private in nature. Foremost among these is the extent to which the letter purported to dispel the "gossip and mystery" about the reasons why the athletic director was fired. Defendant's phrasing implicates cases holding that matters of gossip and curiosity are not public issues within the meaning of anti-SLAPP statutes, e.g., *Weinberg*, 2 Cal.Rptr.3d at 392–93, and that individual employment actions are not appropriate topics for public discussion, and therefore not public issues within the meaning of anti-SLAPP statutes, e.g., *Steep Hill Laboratories, Inc. v. Moore*, 2018 WL 1242182 (N.D. Cal., Mar. 8, 2018); *Olaes v. Nationwide Mut. Ins. Co.*, 38 Cal. Rptr. 3d 467, 473–74 (Cal. Ct. App. 2006). Although these cases are somewhat relevant here, they relate only to one component of defendant's letter to the editor. He did not merely describe the reasons

why the athletic director was terminated, but also testified that he had been a victim of the director's harassment. He further suggested that the resort had failed to intervene after prior instances of harassment had been documented, and that this failure had put both himself and others at risk. Read as a whole, therefore, the letter presented public concerns broader than the mere recitation of gossip about the reasons for the employment decision.

Another aspect is that the defamation claim was brought by one individual against another. The implication here is that the dispute is a private one, between two people, and therefore does not involve the "power dynamics" that characterize "strategic lawsuits against public participation." *Jang*, 331 F.Supp.3d at 336. It may be easier to spot SLAPP suits when the plaintiff is a corporation and the defendant is an individual, but this is not a requirement of the statute's application. The filing of a defamation lawsuit against a person who has disclosed sexual misconduct can involve exactly the type of abusive dynamics that anti-SLAPP statutes are meant to address, either because of asymmetric relationships between the parties involved, see, e.g., *Coleman*, 523 F.Supp.3d at 259–60 (mentor-mentee); *Wentworth*, 2019 WL 2368520 at *6 (professor-student), or because of the dynamics of power and control inherent in the perpetration of sexual and domestic violence. Additionally, the chilling effects of these types of defamation lawsuits are felt by all survivors, including those who may be considering speaking out about their own experiences. For these reasons, although this case is between two individuals, it involves public values that are among those protected by § 1041.

Finally, there is the extent to which the letter went beyond personal testimonial and described events that happened to others. The suggestion is that the letter does not deserve protection as a disclosure of sexual harassment in the workplace, because the defendant was not employed there, and because the descriptions are vague, and not sourced. Again, as the court reads the letter, the point of these references was not to cast aspersions or report upon these instances, but rather to express the valid perception that the sexual harassment that plaintiff experienced might not have happened if prior instances had been addressed, and that other employees might have thereby been better protected, too. In other words, plaintiff's letter was about his own experience, and also a reflection upon the ways in which unaddressed sexual harassment reverberates through workplaces, and throughout the community. In these respects, defendant's letter to the editor was deeply connected to matters of important public dialogue, and therefore protected by the statute.

At issue second is whether the plaintiff has shown that defendant's protected exercise of free speech was "devoid of any reasonable factual support and any arguable basis in law," and that "the defendant's acts caused actual injury to plaintiff." 12 V.S.A. § 1041(e). As discussed above, this standard was developed at a time when the legislative assumption was that the protected exercise of free speech would be environmental activism, and the standard was meant to identify whether the activists were engaged in a "frivolous" or "sham" opposition to the developer's underlying request for a permit, e.g., *Protect Our Mountain Environment, Inc.*, 677 P.2d at 1363–64; *Morse Bros., Inc.*, 2001 ME 70, ¶¶ 22–32; *Demoulas Super Markets, Inc. v. Ryan*, 873 N.E.2d 1168, 1170–71 (Mass. Ct. App. 2007). As applied to other types of cases, the implementation of the standard is more difficult to manage. It is not clear, for example, whether the determination should be made by the court as a factual finding, or instead by a standard analogous to motions for summary judgment, or by a standard similar to motions to dismiss for failure to state a claim upon which relief can be granted, or by some other standard. Other jurisdictions have tried a variety of approaches. See, e.g., *Thurlow v. Nelson*, 2021 ME 58, ¶¶ 11–20, 263 A.3d 494 (adopting a summary-judgment-like procedure after explaining

that Maine has changed its approach four times over the past twenty years); *477 Harrison Ave., LLC v. JACE Boston, LLC*, 74 N.E.3d 1237, 1247–48 (Mass. 2017) (explaining that Massachusetts courts make a factual determination by a preponderance of the evidence). Vermont's reported cases have not clarified the standard; the protected activity has typically been media reporting, and the defamation plaintiffs in those cases have generally failed to state a claim upon which relief can be granted, e.g., *Wolfe*, 2023 VT 50, ¶ 23; *Cornelius*, 2019 VT 4, ¶ 15; *Rivard*, 2023 WL 5994216 at *1; *Gibbons*, 2023 WL 5994062 at *1; *Chandler*, 2015 WL 7628687 at *3; *Cegalis*, 2017 WL 11636068 at *4–5. The media cases do not provide guidance as to how the determination should be made where, as here: (1) the exercise of free speech involved a description of an event that transpired between two people, (2) there were no other witnesses, (3) the evidence presented to the court consists of competing affidavits filed by the two people involved, and (4) there were no other objective reference points or independent reviews in connection with the publication of the material.

In this case, the court need not decide what standard to apply, because the showing that the plaintiff must make is not only that the defendant's protected exercise of free speech was "devoid of any reasonable factual support and any arguable basis in law," but also that "the defendant's acts caused actual injury to plaintiff." 12 V.S.A. § 1041(e)(2). Although Vermont's statute does not explain what it means for a plaintiff to show that a defendant's protected activity caused them "actual injury," the language mirrors the rule that some types of cases involving the constitutional right of free speech must show special damages in the form of some "pecuniary loss suffered as a result of the defamation." *Ryan v. Herald Ass'n, Inc.*, 152 Vt. 275, 281–82 (1989). Maine cases interpreting identical language have agreed that the statute requires a plaintiff to show a "quantifiable" and "reasonably certain" monetary loss that was caused by the defendant's statutorily-protected activity. *Desjardins v. Reynolds*, 2017 ME 99, ¶ 14, 162 A.3d 228; *Nader*, 2012 ME 57, ¶ 38; *Schelling*, 2008 ME 59, ¶ 17; *Wainwright*, 2004 ME 53, ¶ 10. Under this standard, the type of reputational damages that are presumed in ordinary defamation actions are not sufficient to meet the "actual injury" requirement, and allegations of emotional damages are likewise insufficient. *Desjardins*, 2017 ME 99, ¶ 14; *Schelling*, 2008 ME 59, ¶ 18; *Lynch v. Christie*, 815 F.Supp.2d 341, 350 (D. Me. 2011). The point of this requirement is to distinguish between lawsuits that seek compensation for identified harms, as opposed to those that are more likely brought for some other abusive goal. A plaintiff responding to an anti-SLAPP motion must demonstrate the specific amounts of the ascertainable damages in order to avoid dismissal of the lawsuit. *Desjardins*, 2017 ME 99, ¶ 17.

Here, plaintiff has asserted that the publication of the letter caused him to experience "serious injury in the form of embarrassment, humiliation, anxiety, and a weakened ability to find gainful employment and advance his career." However, he has not alleged or asserted any specific monetary losses either in his pleadings or in his accompanying affidavits. 12 V.S.A. § 1041(e)(2). Likewise, he has alleged that he suffered "lost compensation, benefits, and career opportunities," but he has not alleged or asserted any specific monetary losses, nor explained how these would have been caused by the publication of the letter, since he was fired before the letter was published. As such, plaintiff has not sufficiently shown that defendant's publication of the letter caused him actual injury, or that he seeks compensation for a specific, identified harm. *Desjardins*, 2017 ME 99, ¶ 14; *Schelling*, 2008 ME 59, ¶ 18; *Lynch*, 815 F.Supp.2d at 350. He has therefore failed to meet his burden of demonstrating a reason why the lawsuit should not be dismissed under § 1041(e).

For the foregoing reasons, defendant Devon Kurtz's motion to strike is granted. Defendant may submit a motion for an award of costs and reasonable attorney fees, together with itemized records supporting the request, and should do so within 15 days of the file-stamped date of this motion. Plaintiff may submit any opposition to the amount of fees within 10 days thereafter. The court will rule on the motion under the applicable standards, e.g., *Trevor v. Icon Legacy Custom Modular Homes, LLC*, 2019 VT 54, ¶ 86, 210 Vt. 614; *L'Esperance v. Benware*, 2003 VT 43, ¶ 22, 175 Vt. 292; *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Electronically signed on Tuesday, November 28, 2023 pursuant to V.R.E.F. 9(d).

H. Dickson Corbett
Superior Court Judge

Vermont Superior Court
Filed 11/28/23
Windsor Unit