2009 VT 33

## Rachel Allen v. University of Vermont

[973 A.2d 1183]

No. 08-132

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 27, 2009

520

*Heather E. Thomas* of *Lynn, Thomas & Blackman, P.C.,* Burlington, for Plaintiff-Appellant.

*Karen McAndrew* of *Dinse, Knapp & McAndrew, P.C.,* Burlington, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiff, a former University of Vermont (UVM) student, sued the university for monetary damages, claiming discrimination under the Vermont Public Accommodations Act (VPAA). Plaintiff complained that UVM did not treat her report of rape by another student as a harassment claim and did not investigate her charge as required by 16 V.S.A. § 14, a statute designed to prevent harassment in educational institutions. The superior court granted summary judgment in favor of UVM on the ground that plaintiff failed to exhaust her administrative remedies, which the same statute requires as a precondition to her cause of action. *Id.* § 14(b). On appeal, plaintiff argues that (1) UVM's failure to provide her with a copy of its harassment policy at the time she reported the assault precluded UVM's failure-to-exhaust-administrative-remedies defense; (2) existing statutory exceptions to the exhaustion requirement apply to this case; and (3) even if those existing exceptions are not applicable here, the facts in this case should compel this Court to recognize an additional, extra-statutory exception to the legislated exhaustion requirement. We disagree with each of these arguments and affirm the superior court's judgment.

¶ 2. On September 12, 2005, the then-eighteen-year-old plaintiff, who had just begun her freshman year at UVM, reported by e-mail to the university's Women's Center in the Campus Advocacy Program that she had been given a "date rape" drug at a fraternity party and subjected to nonconsensual sexual intercourse. Two days later, plaintiff met with the Center's Advocacy and Violence Prevention Coordinator (Victim's Advocate), described by the student handbook as the person who can provide informa-

tion about available services when a student experiences any form of sexual violence, including sexual assault or sexual harassment.

¶ 3. The Victim's Advocate completed a standardized intake form and interviewed plaintiff. On the form, the Victim's Advocate checked off several reasons for plaintiff contacting the Center, including "Sexual Assault," but did not check off the box designated for "Sexual Harassment." Plaintiff did not couch her rape in terms of having been "harassed," and the Victim's Advocate viewed the allegation as rape rather than harassment. The Victim's Advocate advised plaintiff of several options, including reporting the rape to a police task force specializing in sexual-assault investigations — the Chittenden Unit for Special Investigations. The Victim's Advocate also informed plaintiff that she could report the incident to UVM's Center for Student Ethics and Standards (the Center) as a violation of UVM's code of student conduct. Taking the record in the light most favorable to plaintiff, the Victim's Advocate did not refer plaintiff to UVM policies and procedures for reporting harassment.

¶ 4. Plaintiff opted not to report the rape to police, but on October 10, 2005, she did file a formal complaint with the Assistant Director of the Center. On October 21, the Center obtained plaintiff's and the accused perpetrator's written agreement not to contact each other. On December 9, after several delays, a hearing took place, conducted as required by university rules governing disciplinary actions against students. Following the hearing, on January 26, 2006, the hearing panel concluded that plaintiff failed to prove her charge against the accused rapist. Nevertheless, the Center continued the no-contact order.

¶ 5. During the next few months following the Center's decision, plaintiff's father contacted UVM officials, including an associate general counsel for the university, seeking a more satisfactory resolution of his daughter's complaint. According to plaintiff's father, the general counsel informed him that she had reviewed the case and concluded that the university had done nothing wrong, and that there was nothing more to do. In May 2006, plaintiff withdrew from the university. At no time after the assault did plaintiff or her father assert that the rape should be treated as a harassment complaint; nor did any UVM official assess whether the rape described by plaintiff could or should be considered harassment in violation of university anti-harassment policies.

¶ 6. In August 2006, plaintiff filed a lawsuit against UVM under the VPAA, 9 V.S.A. §§ 4500-4508. The Act creates a private right of action for persons discriminated against in places of public accommodation, including educational institutions. See *Washington v. Pierce*, 2005 VT 125, ¶ 18, 179 Vt. 318, 895 A.2d 173 (concluding that "the VPAA encompasses hostile school environment claims based on peer harassment"). The complaint alleged that plaintiff experienced harassment in the form of a sexual assault by another student and that UVM failed to conduct a prompt investigation as required by 16 V.S.A. § 14, thereby causing her to suffer emotionally and eventually withdraw from the university.

¶ 7. In response to the parties' cross-motions for summary judgment, the superior court ruled that plaintiff could not prevail on her harassment claim because she failed to exhaust her administrative remedies, as required by 16 V.S.A. § 14(b). It was undisputed that plaintiff did not complain to the officials specifically designated by UVM to receive and respond to harassment claims. Absent an applicable exemption, a private cause of action under the VPAA against an educational institution is generally barred unless the plaintiff first satisfies the statutory precondition of bringing a claim of harassment to the attention of the persons designated by the institution to handle such complaints. 16 V.S.A. § 14(b).

¶ 8. In reviewing the trial court's ruling, we consider whether UVM demonstrated that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). Plaintiff argues on appeal (1) that UVM's failure to provide her with a copy of its harassment policy precluded the trial court from dismissing her suit based on a failure to exhaust remedies, and (2) in any event, exceptions to the exhaustion requirement apply. To put these arguments in context, we first review the statutes at issue in this case.

¶ 9. The VPAA prohibits a "place of public accommodation" from denying any person advantages or privileges based on characteristics such as race or sex, among others. 9 V.S.A. § 4502(a). In 2004, the Legislature enacted § 14 of Title 16, which sets forth procedures for addressing harassment claims in schools. The statute mandates educational institutions receiving "actual notice of alleged conduct that may constitute harassment" to conduct a prompt investigation to determine whether any harassment oc-

curred. 16 V.S.A. § 14(a). The statute also recognizes the potential for harassment claims under the VPAA, providing, with respect to such claims, that "if after notice, the educational institution finds that the alleged conduct occurred and that it constitutes harassment, the educational institution shall take prompt and appropriate remedial action reasonably calculated to stop the harassment." *Id.* § 14(b).

¶ 10. The statute explicitly provides, however, that no civil action under the VPAA may be brought "until the administrative remedies available to the claimant . . . pursuant to the harassment policy of a postsecondary school have been exhausted." *Id.* "Notice" is statutorily defined as "a written complaint or oral information that harassment may have occurred which has been provided to a designated employee." *Id.* § 14(c)(3). "Designated employee" is defined, in turn, as "an employee who has been designated by an educational institution to receive complaints of harassment . . . in accordance with the harassment policy of a postsecondary school." *Id.* § 14(c)(1). Pursuant to its adopted and publicized harassment policy, UVM expressly designated its Dean of Students and the Executive Director of the Office of Affirmative Action and Equal Opportunity to receive and respond to harassment complaints. Under the statute, this exhaustion requirement is waived only if the claimant demonstrates one of five enumerated statutory exceptions. *Id.* § 14(b). The exceptions are discussed below.

¶ 11. In *Washington*, we considered a harassment claim in the context of a VPAA action, and in particular the exhaustion requirement contained in § 14. There, we held "that the VPAA encompasses hostile school environment claims based on [student-student] harassment," but that the claimant

> must show that: (1) he or she was the victim of harassing conduct so severe, pervasive, and objectively offensive that it deprived him or her of access to the educational opportunities or benefits provided by the school; and (2) the plaintiff exhausted the administrative remedies available, or that circumstances existed that relieved the plaintiff of the exhaustion requirement.

*Washington*, 2005 VT 125, ¶¶ 18, 35.

¶ 12. The second of the two elements quoted above was at the center of the dispute in *Washington*. Rather than adopt the

subjectively based "deliberately indifferent" or "knew or should have known" standards applied respectively in Title IX and Title VII cases, we focused on the Legislature's exhaustion requirement to satisfy the second element of a student-to-student hostile-school-environment claim. *Id.* ¶¶ 23-34. We noted that the Legislature's purpose for including the exhaustion requirement was balancing "the coordinate duties of the school to provide a harassment-free environment and the harassment victim to look first to the school's mechanisms to redress in-school harassment." *Id.* ¶ 34. We reasoned that adopting the exhaustion requirement as the second element of a student-to-student hostile-school-environment claim under the VPAA would eliminate "the necessity of a separate inquiry into the state of the school's knowledge or the notice received by the school," *id.* ¶ 36, and instead would provide "courts with objective criteria for evaluating the conduct of the parties in a hostile school environment harassment case to a greater extent" than the standards applied in Title IX and Title VII cases, *id.* ¶ 37.

¶ 13. With this legal background in mind, we now return to plaintiff's claims on appeal. She first contends that UVM's failure to provide her with a copy of its harassment policy precluded application of the exhaustion requirement. According to plaintiff, once she presented the Victim's Advocate and the Center's Assistant Director with notice of conduct that could be construed as harassment, the university was obligated to provide her with a copy of its harassment policy, which would have informed her of the persons designated to receive complaints of harassment and allowed her to file a harassment complaint.

¶ 14. We find this argument unavailing. As noted above, as a policy matter, the Legislature imposed a strict administrative exhaustion requirement upon those seeking to raise harassment claims against schools under the VPAA. This is particularly critical with respect to hostile-school-environment claims based on student-to-student conduct unrelated to harassment by school personnel. For that reason, in *Washington*, we adopted the exhaustion requirement as an element of such a claim under the VPAA. Indeed, we did so to avoid exactly what plaintiff wants the courts to do here — examine her report of sexual assault and determine whether university officials should have understood it to be a claim of harassment.

¶ 15. The reality is that plaintiff never expressed her complaint in terms of "harassment," and, not too surprisingly, the Victim's Advocate who met with plaintiff did not view plaintiff's report of rape as one of civil harassment rather than a criminal rape and a violation of expected student conduct. The dissent states that UVM "chose not to treat this as a case of harassment," and inaccurately characterizes the university's response as a "refusal to view the conduct as harassment." *Post*, ¶¶ 42, 46. This view is neither supported by the record nor consistent with the trial court's finding that the Victim's Advocate perceived the complaint to be one of rape rather than harassment. University officials did not ignore or discount plaintiff's rape complaint, but rather informed plaintiff that she could report the incident to the police rape task force and file a complaint with the Center, which addresses student conduct violations. The university no more "chose not to treat this as . . . harassment," to use the dissent's phrase, *post*, ¶ 42, than the plaintiff "chose" not to make a harassment claim rather than a rape complaint. Plaintiff complained about being raped, and the Victim's Advocate, as well as the Center's Assistant Director, simply responded to a rape complaint.

¶ 16. Plaintiff, as well as the dissent, argues that university officials should have automatically construed her complaint as one of harassment. The dissent posits that it was not even "a close case" that a single incident of rape of one student by another should have been immediately treated as harassment. *Post*, ¶ 46. The law, however, is not so certain. Assuming, arguendo, that plaintiff both made her complaint to the proper parties and meant to complain of "peer harassment" as contemplated by VPAA, isolated incidents of misconduct ordinarily are not "pervasive" in nature and thus will not support an action under the VPAA alleging a hostile school environment created by student-student harassment. See *Washington*, 2005 VT 125, ¶ 35 (holding that "a plaintiff bringing a VPAA action based on a hostile school environment created by student-student harassment must show," in addition to exhaustion of administrative remedies, that "he or she was the victim of harassing conduct so severe, pervasive, and objectively offensive that it deprived him or her of access to the

educational opportunities or benefits provided by the school").[1] Nothing of that sort was brought to the attention of the Victim's Advocate or to the Center's Assistant Director. Nor did plaintiff's father, according to the record before us, make such a claim to the associate counsel's office. Nor does anything in the record suggest that any university official had reason to treat the alleged rape as a pervasive problem, either on campus or against plaintiff. We agree with the dissent that we need not consider today whether an isolated personal violation can ever amount to sexual harassment, but note only that nothing in the instant complaint would necessarily lead the responding university staff to be cued to sexual harassment when reacting to an expressed complaint of an isolated and criminal rape.

¶ 17. Plaintiff, and her father, could also have made an explicit harassment complaint had they viewed the episode as harassment as well as rape. Plaintiff did not, however, follow "the precise procedure contemplated by the statute" as claimed by the dissent. *Post*, ¶ 50. Students were notified that UVM's harassment policy was available to students online on the university's website. The harassment policy explicitly named the individuals designated to accept claims of harassment, as required by statute. See 16 V.S.A. § 14(c)(1). The student handbook stated that each student is responsible for being familiar with important rights and policies,

---

[1] That the harassing action must be pervasive for purposes of establishing a hostile educational environment was imported into our construction of the VPAA from the United States Supreme Court's construction of the analogous provisions of Title IX designed to remedy harassing conduct "so severe, pervasive and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Washington*, 2005 VT 125, ¶ 26 (internal quotations omitted). As explained in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), "[a]lthough, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Id.* at 652-53. Compare *Williams v. Bd. of Regents*, 477 F.3d 1282, 1297 (11th Cir. 2007) (concluding that plaintiff alleged sufficient facts to show pervasive discrimination where she was subjected to two separate acts of sexual assault by multiple persons during continuous series of events that were part of conspiracy to attack her), with *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1357-58 (M.D. Ga. 2007) (holding that single incident of alleged sexual assault is not sufficient to demonstrate pervasive discrimination because, however traumatic to its victim, it is not likely to have systematic effect on educational activities).

including polices on sexual assault and harassment, and cited the specific web page where the policies could be found. The dissent faults the university for publishing the applicable policy "only online," as if online is obscure or unreasonably remote. *Post*, ¶¶ 32, 37, 43. In this age, however, it can hardly be doubted, especially for university students, that online is a prime, if not *the* primary, source for information.

¶ 18. Plaintiff, and the dissent, seek to substitute what she did — report a rape to the Victim's Advocate and the Center's Assistant Director, for what the statute and the university's harassment policy required: a report or claim of harassment to UVM's designated harassment officials. The dissent justifies this substitution on a theory of actual notice (of what it maintains should have been considered as harassment) to persons who were capable of responding to a harassment claim, or capable of referring it to the proper officials. But this is exactly the kind of vicarious liability approach to notice not adopted by the Legislature. Indeed, the difficulty in determining if there was proper notice of harassment claims is why, in *Washington*, we adopted as an element of a VPAA action claiming peer harassment the express statutory requirement that complaints be made to the person explicitly designated to accept such complaints. See *Washington*, 2005 VT 125, ¶¶ 36-37. We cannot know, for example, whether the officials statutorily designated by UVM to handle sexual harassment claims — had they been notified as required by statute — would have considered plaintiff's report of a single incident of sexual assault by another student as warranting a harassment investigation.

¶ 19. Even assuming, for argument's sake, that UVM's directions were too obscure for plaintiff to follow before she filed her lawsuit, she still did not seek her statutorily mandated administrative remedies even when that defense was brought to her attention at the time she filed her civil suit claiming a violation of the VPAA. Instead, plaintiff chose to pursue her harassment claim in the first instance in a discrimination action filed directly in the superior court under the VPAA. We agree with the superior court that, consistent with our holding in *Washington*, the exhaustion requirement contained in § 14(b) precluded her from independently filing suit without first pursuing her administrative remedy. Because plaintiff failed to notify UVM

of a harassment claim according to the university's policy, and thus failed to satisfy the statutory exhaustion remedy, she is precluded from initiating this discrimination claim in the superior court under the VPAA.

¶ 20. If we were to accept plaintiff's reasoning that the statutory exhaustion requirement should be waived because her assault complaint could have been construed as a harassment claim, then we would effectively mandate a subjective examination of what school officials knew, or should have known, at the time — exactly the debate we intended to foreclose and avoid in *Washington*. For the reasons stated in *Washington*, we will not undermine the plain intent of the Legislature to require administrative exhaustion as an express precondition to civil harassment claims under the VPAA.

¶ 21. Plaintiff argues, however, that even if exhaustion is not excused by UVM's alleged failure to act on her complaint, statutory exceptions to the requirement apply in this case. Under § 14(b), a plaintiff bringing a harassment claim under the VPAA need not exhaust administrative remedies if (1) the educational institution did not maintain a harassment policy; (2) there was no timely determination on a harassment complaint; (3) requiring exhaustion of administrative remedies would have jeopardized the health or safety of the complainant; (4) exhaustion would have been futile; or (5) requiring exhaustion would have subjected the student to substantial and imminent retaliation. Plaintiff relies upon the first, second, and fourth exceptions.

¶ 22. Plaintiff's reliance on the first two exceptions is based upon her erroneous assumption that harassment policies, time frames, and responses mandated by 16 V.S.A. § 565, but not followed by UVM, control this case. Section 565 requires school boards and school districts to establish policies and procedures to prevent harassment in local elementary and secondary schools. Section 14(b) precludes VPAA actions "until the administrative remedies available to the claimant under the policy adopted by the educational institution pursuant to subsection 166(e) or 565(b) of this title or pursuant to the harassment policy of a postsecondary school have been exhausted." As indicated above, the first exception to the exhaustion requirement is that the educational institution did not maintain a harassment policy as required by statute. Plainly, that is not the case here. Section 166(e) relates to

independent schools, and § 565(b) relates to public school districts operating elementary and secondary schools. Because § 565 relates only to public school districts, its mandatory provisions with respect to their harassment policies are not applicable to post-secondary harassment policies at UVM.

■ ¶ 23. Instead, the statutory requirements for harassment policies implemented by UVM are set forth in 16 V.S.A. § 2284(a). There is no claim that they were not met here. Indeed, UVM is a postsecondary school that had a harassment policy in place under § 2284(a) during all times relevant to this case. Therefore, the first exception to the exhaustion requirement does not apply.

■ ¶ 24. The second exception waives the exhaustion requirement if the educational institution failed to render a determination on a harassment complaint within the time limits set forth in § 565(b)(1). As just indicated, § 565 concerns public elementary and high school districts and does not apply to college harassment policies governed by § 2284. Even if plaintiff argued that the Legislature nevertheless intended § 565 response time limits to apply to all educational institutions, including postsecondary colleges, with respect to § 14(b), we need not address such an argument given plaintiff's failure to provide actual notice of a harassment complaint and exhaust her administrative remedies. Therefore, the second exception does not apply.

¶ 25. Plaintiff also argues that raising a harassment complaint and exhausting her administrative remedies would have been futile, given that (1) UVM's associate general counsel told plaintiff and her father that the university had done everything that they were legally obligated to do; and (2) UVM's litigation counsel later took the position, in defense against plaintiff's civil action, that rape was not harassment. We find no merit to this argument. According to the record, the incident was brought to the associate counsel's attention as the father's dissatisfaction with how the university responded to his daughter's rape. The associate counsel wrote only that there appeared nothing more for UVM to do in following up on the rape complaint, not that it was refusing to treat or investigate the complaint as a claim of sexual harassment — again, not an issue asserted by father. That UVM later asserted certain legal positions in response to plaintiff's discrimination lawsuit — after her withdrawal from the university and its processes — does not necessarily confirm that UVM's designated

employees would have responded the same way to a claim of harassment, had such an explicit complaint been made by plaintiff. We cannot presume that the university would have refused to recognize or investigate a harassment claim simply because, in the context of defending against a lawsuit where all defensive theories must ordinarily be asserted or waived, its outside legal counsel later took a position that the conduct claimed as triggering plaintiff's right to sue was legally insufficient to constitute harassment.

¶ 26. As the trial court concluded, nobody — neither plaintiff nor university officials — apparently perceived that they were dealing with harassment. Cf. *Washington*, 2005 VT 125, ¶ 43 (refusing to apply futility exception, given that plaintiff "offered no evidence that the school had mishandled or refused to deal with issues of which it was aware"). Rather, plaintiff reported a rape, and UVM treated it as such. If the futility exception applied every time a plaintiff complained of an incident that was clearly a crime, but not perceived as also amounting to harassment — with no opportunity for the respondent to answer a specific claim of harassment — it could effectively swallow the exhaustion requirement. Cf. *Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 133-34 (2d Cir. 2001) (rejecting claim of futility as excuse for failing to exhaust administrative remedies where party claiming futility did not demonstrate that she had made unambiguous application for benefits that was clearly denied in decision by administrative body).

¶ 27. UVM is entitled to have its designated employees answer an express harassment claim before its opportunity to examine and correct its position is foreclosed. Cf. *MFS Sec. Corp. v. Sec. & Exch. Comm'n*, 380 F.3d 611, 621-23 (2d Cir. 2004) (holding that administrative remedies must be exhausted, notwithstanding claims of futility based on past errors or bias, because purpose of administrative review is to promote efficient resolution of disputes and give administrative bodies opportunity to correct their own errors and provide foundation for further review). Because exhaustion of administrative remedies is a critical predicate to a VPAA action claiming a hostile school environment based on student-to-student conduct, UVM is entitled to avoid litigation by addressing duly reported harassment. That did not occur here, and thus plaintiff fails to demonstrate that the futility exception to the exhaustion requirement applies.

¶ 28. Finally, plaintiff argues that, even if none of the explicit statutory exceptions to exhaustion apply, this Court should recognize an additional exception to that statutory requirement based on the circumstances of this case. In making this request, plaintiff does not suggest a specific exception in addition to those enumerated in the statute, but simply posits that the exhaustion requirement should not apply here. Plaintiff essentially contends that she should not have to exhaust her administrative remedies as required by statute because UVM did not inform her plainly enough of her right to pursue a complaint under its harassment policy.

¶ 29. This argument fails both as an appeal to fairness and as an invitation to rewrite the statute. Assuming, for argument's sake, that UVM "dropped the ball" in failing to refer plaintiff to the officials designated to respond to harassment complaints, plaintiff shows no prejudice that could not have been cured by filing a claim of harassment after harassment was specifically alleged in her civil lawsuit. Even after her disappointment with the university's initial response, complying with the exhaustion requirement would have been but a slight burden on plaintiff, requiring her to postpone her lawsuit while the university did or did not act upon a duly filed harassment complaint. But plaintiff chose not to follow "the precise procedure contemplated by the statute," as the dissent contends she did. *Post,* ¶ 50.

¶ 30. The dissent would reverse the trial court based on the principle that notice of the alleged rape to the Victim's Advocate and the Center's Assistant Director should be considered notice to the employees designated to accept harassment complaints, even though the statute explicitly requires that harassment complaints be made to the designated employees. Such constructive notice cannot apply here because plaintiff's VPAA cause of action does not exist outside of the statute that makes it explicitly conditioned upon exhaustion of administrative remedies by actual notice to the designated employee, unless excused by specific statutory exceptions. Those exceptions do not recognize constructive notice to designated persons through reports to other, nondesignated employees. Indeed, such would frustrate the clear intent of the statute and the import of *Washington.*

¶ 31. Nor do the statutory exceptions include a "catch-all" exhaustion exemption based on general circumstances such as described by plaintiff. Even if the university could have posted its

procedures differently, they were not hidden. While responsive to her rape complaint, nothing in the record suggests the university sought to defeat or discourage a sexual harassment claim by plaintiff. In effect, plaintiff advocates that we simply erase from the statute the exhaustion requirement of § 14(b), explained in *Washington* as a critical element of a VPAA action claiming discrimination based on student-to-student harassment. We decline to do so. See *Murphy Motor Sales, Inc. v. First Nat'l Bank*, 122 Vt. 121, 123, 124, 165 A.2d 341, 342, 343 (1960) (noting that courts "may not legislate in the guise of [statutory] construction," and that "great care should be exercised by the court not to expand proper construction of a statute into judicial legislation").

*Affirmed.*

¶ 32. **Johnson, J.,** dissenting. It is absurd, on this record, for the University of Vermont to claim that plaintiff failed to provide it with notice of "conduct that may constitute harassment," and that plaintiff thereby failed to exhaust her administrative remedies. Plaintiff followed the precise reporting process urged upon her by the university. She informed the Victim's Advocate that she had been sexually assaulted by another student. Following the advocate's advice, she filed another complaint with the university's Center for Student Ethics and Standards (CSES). Her failure to file a third complaint with one of two individuals designated by the university to receive harassment claims — individuals whose identities were available only online — was an error invited by the university and it was harmless. The purpose underlying the statutory notice requirement was plainly satisfied in this case, and the university was not entitled to dismissal on exhaustion grounds. I would reverse the trial court's decision and I therefore dissent.

¶ 33. In enacting the laws at issue in this case, the Legislature recognized both that "students should be free of harassment in educational institutions" and that "educational institutions should have the opportunity to remedy promptly and appropriately allegations of harassment." 2003, No. 91 (Adj. Sess.), § 1(3), (4). The notice and exhaustion requirements in 16 V.S.A. § 14 serve these goals. Thus, the statute requires that when an educational institution receives "actual notice of alleged conduct that may constitute harassment," it must "promptly investigate to determine whether harassment occurred." 16 V.S.A. § 14(a). If, after notice, the school "finds that the alleged conduct occurred and that it

constitutes harassment," it must "take prompt and appropriate remedial action reasonably calculated to stop the harassment." *Id.* § 14(b). The statute defines "notice" as oral or written information that harassment may have occurred provided to certain designated officials. This presumably ensures that individuals with the ability to address the alleged conduct are aware of the allegations. Cf. *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1346, 1346 n.30 (M.D. Ga. 2007) (explaining that recovery for student-on-student sexual harassment under Title IX, 20 U.S.C. § 1681(a), is predicated on a showing that an "appropriate person" had actual knowledge of alleged discrimination or harassment, and stating that an appropriate person " 'is, at a minimum, an official . . . with authority to take corrective action to end the discrimination' " (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998))).

¶ 34. As an additional protection, 16 V.S.A. § 14(b) requires that a claimant exhaust any administrative remedies available under a school's harassment policy before filing a discrimination claim under the Vermont Public Accommodations Act, 9 V.S.A. §§ 4500-4508. We have stated that this standard "eliminates the necessity of a separate inquiry into the state of the school's knowledge or the notice received by the school" because "notice on the part of the school would follow logically from a showing that the plaintiff exhausted his or her remedies." *Washington v. Pierce*, 2005 VT 125, ¶ 36, 179 Vt. 318, 895 A.2d 173. Additionally, we have noted that the exhaustion requirement provides "courts with objective criteria for evaluating the conduct of the parties in a hostile school environment harassment case," more so than a "knew or should have known" standard as employed in Title VII cases, or one that evaluates whether a school has been deliberately indifferent to known student-on-student harassment in its schools as applied in Title IX cases. *Id.* ¶ 37 (quotation omitted). As relevant here, the exhaustion of administrative remedies is not required where the claimant demonstrates that exhaustion would be futile. 16 V.S.A. § 14(b)(4).

¶ 35. In *Washington*, the plaintiff, a high school student, claimed that she was denied access to full and equal educational opportunities because of a hostile environment caused by pervasive student-on-student racial and sexual harassment. We concluded, as a matter of law, that the claim failed because plaintiff could not demonstrate that she had exhausted her administrative remedies

or "that she somehow was relieved of that responsibility." *Washington*, 2005 VT 125, ¶ 40. In *Washington*, the plaintiff did not lodge *any* complaint with the school administration, nor did she present any evidence that misconduct had occurred in the presence of school personnel. While plaintiff's mother had made general complaints to unidentified school officials, none of these complaints were specific to plaintiff's case. Accordingly, we concluded that "by choosing not to raise any complaints with a school official, plaintiff failed to exhaust her administrative remedies." *Id.* ¶ 41.

¶ 36. The majority misreads *Washington* to support dismissal of this case on similar grounds. Unlike *Washington*, however, the university here had both notice of the alleged conduct and an opportunity to respond. Plaintiff repeatedly complained to the university about being sexually assaulted by another student, and she complained to those individuals specifically identified by the university as appropriate. The university concluded that a proper response to a claim of sexual violence was to hold a student disciplinary hearing with the alleged victim acting as the prosecutor. Plaintiff engaged in this hearing process — she availed herself of the administrative remedies offered to her by the university and she exhausted them.

¶ 37. Indeed, the university created the very procedure it now claims is insufficient. It advised its students to contact the Victim's Advocate "[i]f you or someone you care about experiences sexual violence (including rape, sexual assault, sexual harassment, unwanted sexual touching or contact, etc.)." The student handbook stated that the Victim's Advocate would provide assistance and information "about what services exist on and off campus" and that she would "help you decide what to do after an assault." This advice was reiterated several times throughout the student handbook. The sexual harassment policy, in contrast, was not included in the handbook but was instead available only online.

¶ 38. Thus, following the university's direction, plaintiff contacted the Victim's Advocate, first by email and then in person. She reported being raped — conduct that, from an objective standpoint, "may constitute harassment."[2] 16 V.S.A. § 14(a); see

---

[2] The question of whether plaintiff's allegations are sufficient to support her discrimination claim is not before us, and her failure to describe "pervasive" misconduct to the Victim's Advocate is immaterial. *Ante,* ¶ 16. The university has

also *id.* § 11(a)(26)(A) (defining "harassment" in part as "an incident or incidents of . . . physical conduct based on or motivated by a student's . . . sex . . . that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance . . . or creating an objectively intimidating, hostile, or offensive environment"); Office for Civil Rights, U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic* 4, 7 (2008), available at http://www.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf (explaining that "[s]exual harassment includes conduct that is criminal in nature, such as rape, sexual assault, [and], dating violence," and noting that if sufficiently severe, single or isolated incidents of sexual harassment can create a hostile environment for purposes of Title IX); Univ. of Vt., *Sexual Harassment: Students* (effective January 2, 2008) (defining sexual harassment to include physical conduct of a sexual nature where conduct has effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment, and providing as an example "unwelcome touching"), available at http://www.uvm.edu/~uvmppg/ppg/student/sexharassstudent.pdf. Certainly, "[i]t goes without saying that forcible rape is 'unwelcome physical conduct of a sexual nature,'" and that "[r]ape is also, by definition, a form of harassment based on sex." *Lapka v. Chertoff,* 517 F.3d 974, 982-83 (7th Cir. 2008) (quotation omitted); see also *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 967 (9th Cir. 2002) (stating that "[r]ape is unquestionably among the most severe forms of sexual harassment," and citing cases recognizing that an isolated incident, if sufficiently serious, can create hostile work environment). Plaintiff plainly described both sexual assault and sexual harassment to the Victim's Advocate. Cf. *Brock v. United States,* 64 F.3d 1421, 1423 (9th Cir. 1995) ("Just as every murder is also a battery, every rape committed in the employment setting is also discrimination based on the employee's sex.").

¶ 39. Yet the Victim's Advocate, and apparently the university, did not consider sexual assault to be a form of sexual harassment, and despite the handbook's promise, the Victim's Advocate did not

---

an obligation to respond to complaints of conduct that may constitute harassment, not merely claims of pervasive misconduct.

advise plaintiff of all of the services available to her. She did not inform plaintiff that the university would conduct an investigation into her allegations only if plaintiff filed an additional complaint with one of two individuals designated by the university to receive harassment complaints. The Victim's Advocate did not report the alleged conduct to the designated individuals herself. She did not refer plaintiff to the online sexual harassment policy. Instead, the Victim's Advocate informed plaintiff that she had two choices — she could file a complaint with the CSES alleging a violation of the Code of Student Rights and Responsibilities, or she could file a criminal complaint with the police.[3]

¶ 40. Plaintiff, an eighteen year old freshman, opted to pursue a complaint with the CSES, and she executed a written document that described being drugged and sexually assaulted on campus by another student. The Assistant Director of the CSES, who oversaw the hearing process, again saw no need to have the university independently investigate plaintiff's allegations. Rather, plaintiff, acting alone, was required to prove her rape case against the alleged perpetrator, who brought three of his friends as witnesses, in a hearing before the student judicial council. Approximately six weeks after this hearing, the alleged perpetrator was found "not responsible" for the alleged violations of the student code, including "offenses against persons," a nonconsensual sexual act, sexual assault, and possession or use of an illegal substance.

¶ 41. Both before and after this decision, plaintiff's father contacted the university, expressing his concerns about the way in

---

[3] In fact, the Student Code allows members of the university staff to report code violations to the CSES, and it also states that "[p]erceived criminal activity should be reported immediately to UVM Police Services, which will then share information with the Dean of Students or CSES as appropriate." The Dean of Students is the university official responsible for oversight of the Student Code; he was also one of the two employees designated by the university to receive harassment complaints. I note that the university's "Procedures for Investigating and Resolving Discrimination Complaints," effective April 18, 2007, now *requires* certain university officials who become aware of conduct that they believe may violate the University's nondiscrimination policies to report that conduct to the Affirmative Action and Equal Opportunity Office. This includes, but is not limited to: supervisors or managers; a chair, director or dean of an academic unit; any other person with a title at the level of Director or higher; and Student Affairs personnel with oversight responsibilities for students or employees. See Univ. of Vt., *Procedures for Investigating and Resolving Discrimination Complaints*, available at http://www.uvm.edu/~aaeo/pdf/discrimination.pdf.

which plaintiff's sexual assault complaint was being addressed. In April 2006, the university's associate general counsel informed plaintiff's father that the university had violated no law or right of plaintiff in following the CSES process. At no time did the university assert that plaintiff had made the wrong claim or that she needed to file another complaint before the university would promptly investigate whether harassment had occurred. In May 2006, plaintiff withdrew from the university.

¶ 42. Given this record, the university cannot credibly assert that plaintiff failed to exhaust her administrative remedies. It relies on a statutory provision designed to protect schools that have *no* notice of conduct that may constitute harassment and, thus, have no opportunity to take appropriate action to investigate the claims before being accused of discrimination. That the university chose not to treat this as a case of harassment, in violation of its own policy and a common-sense definition of the term, does not show that it had no notice. Nor does it absolve the university of its obligation to conduct an investigation into the alleged conduct. The question is not whether the victim "viewed the episode as harassment," *ante*, ¶ 17, but whether her description of being raped was "conduct that may constitute harassment," 16 V.S.A. § 14(a).

¶ 43. Particularly galling is the university's assertion that it "would simply be unworkable and unfair — and contrary to the expressed intent of the legislature" — to hold it responsible "where a student has complained to some University employee or official somewhere on campus of conduct that may [or may not] constitute harassment." The university would have us ignore the fact that it *encouraged* students to report rape, sexual harassment, and other conduct to the Victim's Advocate in multiple places throughout the student handbook, while at the same time, it made its sexual harassment policy available only online.

¶ 44. In keeping with its circular reasoning, the university also claims the right to take disciplinary steps against a student found to have engaged in harassment, while at the same time avoiding liability under the VPAA until a victim "at the very least provide[s] the institution with notice of the harassment, and allow[s] it an opportunity to 'take prompt and remedial action reasonably calculated to stop the harassment.'" This is nonsensical. If the university is conducting a student hearing on a harassment claim, it plainly has notice of the alleged harassment.

To hold otherwise allows the university to avoid liability under the VPAA if it succeeds in frustrating a student's ability to make a harassment complaint. Nothing could be further from the Legislature's intent in enacting 16 V.S.A. § 14.

¶ 45. The majority nonetheless credits the university's position, relying on a cramped interpretation of 16 V.S.A. § 14(b) that undermines the very purpose the statute is designed to serve. We have construed the exhaustion requirement in § 14(b) as a means of showing that an educational institution had notice of conduct that may constitute harassment. *Washington*, 2005 VT 125, ¶ 36 (stating that "notice on the part of the school would follow logically from a showing that the plaintiff exhausted his or her remedies"). There is nothing talismanic about the two individuals designated by the university to receive harassment complaints — these individuals merely serve to ensure that the university has notice and an opportunity to respond to claims of harassment. Where, as here, the university plainly had notice of the alleged conduct, and in fact, responded in a way it believed was appropriate, how can dismissal possibly be appropriate on exhaustion grounds?

¶ 46. This case does not require the Court to evaluate whether the university should have known about alleged harassment, as the majority suggests, or to examine plaintiff's "report of sexual assault and determine whether university officials should have understood it to be a claim of harassment." *Ante*, ¶ 14. It does not require us to engage in a "separate inquiry into the state of the school's knowledge or the notice received by the school." *Washington*, 2005 VT 125, ¶ 36. Unlike *Washington*, it is undisputed here that the university *did* know about the conduct, and its refusal to view the conduct as harassment is not dispositive. This Court need only review whether the conduct complained about — rape — was within the objectively stated definition of harassment. This does not present a close case, and it is certainly not an inquiry that the Court intended to foreclose in *Washington*.

¶ 47. The majority also fails to recognize that the result in this case would have been exactly the same even if plaintiff had reported the conduct, for a third time, to the designated employees. The university suggests that the conduct reported by plaintiff "does not substantively describe sexual harassment which the University could address in any way differently than it treated her sexual assault complaint." It faults plaintiff for failing to identify

"what additional remedial measures the University might have taken had she initiated the harassment-investigation process." The university's associate general counsel provided plaintiff's father with essentially the same message.

¶ 48. The majority nonetheless reasons that one "cannot presume that the university would have refused to recognize or investigate a harassment claim simply because, in the context of defending against a lawsuit where all defensive theories must ordinarily be asserted or waived, its outside legal counsel later took a position that the conduct claimed as triggering plaintiff's right to sue was legally insufficient to constitute harassment." *Ante,* ¶ 25. The facts do not fit the majority's theory. The university refused to recognize and investigate this as a harassment claim at the outset, and it reiterates the validity of that position in this appeal. Giving plaintiff the benefit of all reasonable doubts and inferences, one can certainly presume from this record that the university would not have responded any differently in addressing plaintiff's claim had it been couched in terms of "harassment." Under these circumstances, exhaustion, if not already proven, would have been futile.

¶ 49. Finally, I fail to grasp the majority's argument that the plaintiff could have easily filed a complaint with one of the university's "designated employees" after she filed this lawsuit to avoid dismissal on exhaustion grounds. *Ante,* ¶ 17. As discussed above, the university had advised plaintiff prior to this lawsuit that it had done nothing wrong in addressing her sexual assault claim through the CSES process. Plaintiff no longer attends the university. If filing a complaint with the university at this late stage would satisfy the majority, notwithstanding the fact that the university has provided plaintiff with all of the process it believes was appropriate, then the majority has truly turned the exhaustion provision into a meaningless requirement.

¶ 50. This is not a case, as the majority asserts, where "plaintiff chose to pursue her harassment claim in the first instance" in superior court. *Ante,* ¶ 19. To the contrary, plaintiff followed the precise procedure contemplated by the statute and described in *Washington* — she "look[ed] first to the school's mechanisms to redress in-school harassment," and the university had the "opportunity to respond to alleged harassment before being subject to litigation." *Washington,* 2005 VT 125, ¶¶ 34, 32. To allow the university to escape the lawsuit at this stage, given the labyrinth

it created, its failure to disclose critical information to the student, and its failure to respond to the complained-of conduct, makes a mockery of the Legislature's purpose. This case was wrongly dismissed on exhaustion grounds, and I therefore dissent.